## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF**<br><br>**40 GOODWIN AVENUE, SALEM, VIRGINIA 24153 (TARGET ADDRESS #1)**<br><br>**3434 SALEM TURNPIKE NW, SELF STORAGE UNIT "B30" SALEM, VIRGINIA 24017 (TARGET ADDRESS #2)**<br><br>**3919 PLANTATION ROAD NE, ROANOKE , VIRGINIA 24012 (TARGET ADDRESS #3)**<br><br>**SILVER 2020 DODGE CHARGER, VIN: 2C3CDXGJ1LH204674**<br><br>**BLUE 2001 LINCOLN TOWN CAR, VIN: 1LNHM81W21Y737756** | **UNDERSEAL**<br><br>Case No. ___7:21mj161_____ |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A WARRANT TO SEARCH AND SEIZE

I, Daniel Bailey, a Task Force Office with the Drug Enforcement Administration, being

first duly sworn, do hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the premises, outbuildings, and curtilage of

locations known as **40 Goodwin Avenue, Salem Virginia 24153**, hereinafter referred to as

**Target Address #1; 3434 Salem Turnpike NW, self-storage unit "B30", Salem Virginia**

**24017**, hereinafter referred to as Target Address #2; **3919 Plantation Road NE, Roanoke**

**Virginia 24012**, hereinafter referred to as Target Address #3; a **silver 2020 Dodge Charger,**

VIN:  **2C3CDXGJ1LH204674**;  and  a  **blue  2001  Lincoln  Town  Car,  VIN:**
**1LNHM81W21Y737756.**  Target Address #1, Target Address #2, and Target Address #3 are
located within the Western District of Virginia. The silver Dodge Charger and blue Lincoln
Town Car will be searched if located within the Western District of Virginia within the next 14
days. **Target Address #1** is described as a two-story town-home residence constructed of
brick/beige vinyl siding with a brown shingle roof. The number "40" is posted on the exterior
wall to the left of the front door of **Target Address #1**. **Target Address #2** is described as a
self-storage unit, with an orange garage door, with "B30" posted on that door. Target Address #2
is located within the security fence of the U-Haul property. **Target Address #3** is described as a
single-story, single family residence constructed of brick with a brown shingle roof. Based on the
investigation to date, these properties have been identified and are believed to be used by
Jeriwon TAYLOR (hereinafter TAYLOR) as a stash location to store methamphetamine, heroin,
indicia of drug distribution, and/or drug proceeds.

2.      I am an investigator or law enforcement officer of the United States within the
meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States
who is empowered by law to conduct investigations of, and make arrest for, the offenses
enumerated in Titles 18, 19, 21, 31 of the United States Code and other related offenses, since
2017.

3.      I am a Task Force Officer with the Drug Enforcement Administration (DEA) and
have been since 2017.  I am also a Detective with the Lynchburg Police Department (Virginia)
and have been so employed since 2002. I am currently assigned to investigate drug trafficking
organizations as a member of the DEA, Washington Field Division/Roanoke District Office.  My
duties as a Task Force Officer involve the investigation of various criminal activities of narcotics

2

traffickers and their associates.  In investigating these matters, I have acted as a case agent, an undercover agent, and a contact agent for confidential sources.  These investigations have resulted in the issuance of federal search warrants, seizure warrants, indictments, and convictions of persons for federal narcotics violations.  During my employment as a law enforcement officer, I have received multiple hours of training in narcotics enforcement and investigative techniques, and I have personally participated in numerous investigations.  I have also spoken on numerous occasions with informants, suspects, and other experienced narcotics traffickers concerning the methods and practices of drug traffickers, including the methods and practices used by traffickers of methamphetamine, heroin, and cocaine. I am familiar with narcotics traffickers' methods of operation in the distribution, storage, and transportation of narcotics, the collection of money, which represents the proceeds of narcotics trafficking, and the laundering of proceeds derived from narcotics trafficking.  I am aware that narcotics traffickers often communicate with their associates and/or customers via cellular telephones and other electronic means.  I am also aware narcotics traffickers often change or switch cellular telephones and other communication devices to maintain the covertness of their activities. I have been involved in the execution of numerous search warrants on electronic devices, including cellphones, and in obtaining location information for those devices.

4.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.     Based on the facts set forth in this affidavit, there is probable cause to believe that Jeriwon TAYLOR ("TAYLOR"), and others, are engaged in a conspiracy to violate federal drug

laws, specifically: possession with intent to distribute or distribution of controlled substances, in violation of 21 U.S.C. § 841(a); and conspiracy to possess with intent to distribute or distribute controlled substances in violation of 21 U.S.C. § 846. There is probable cause to search the locations described in Attachment A for evidence, contraband, and/or fruits of these crimes further described in Attachment B.

## PROBABLE CAUSE

6.    This affidavit is made in support of a search warrant to search the TARGET ADDRESS #1 and TARGET ADDRESS #2, which are within the Western District of Virginia. Further, based on my training and experience, I believe that the location located at the TARGET ADDRESS #1 and TARGET ADDRESS #2 are being utilized to store and/or secure drugs, U.S. Currency, and documentation related to drug trafficking activities.  Said documentation would include hard copy documentation, as well as digitally stored information.

7.    The United States, including Drug Enforcement Administration ("DEA"), Virginia State Police ("VSP"), and the Lynchburg Police Department ("LPD"), are conducting a criminal investigation of TAYLOR and others regarding violations of distribution and possession with intent to distribute methamphetamine and other controlled substances, in violation of 21 U.S.C. § 841(a)(1), and conspiracy to distribute methamphetamine and other controlled substances, in violation of 21 U.S.C. § 846.

8.    On October 27, 2021, law enforcement conducted a post-Miranda interview of a Co-conspirator #1 ("CC-1"). CC-1 has been charged in Lynchburg, Virginia for narcotics distribution and firearm related offenses and is awaiting trial. CC-1 has pending firearms-related charges in Bedford County, Virginia and Amherst County, Virginia. CC-1 has a pending firearms charge in Salem, Virginia. CC-1's criminal history reflects ten felony convictions,

4

including: Grand Larceny, Probation Violation, Burglary, and Distribution of Controlled Substance. CC-1 provided statements to law enforcement about CC-1's involvement in a drug trafficking organization that were against CC-1's penal interest. CC-1 assisted law enforcement with this investigation with the hope of receiving potential consideration on CC-1's criminal charges.

9.      CC-1 identified FNU "JAE" LNU as a source of supply for methamphetamine. As later described in this affidavit, FNU "JAE" LNU was identified as Jeriwon TAYLOR during the course of this investigation. For the purpose of this affidavit, FNU "JAE" LNU will be referenced as TAYLOR. CC-1 advised that TAYLOR was a multi-pound distributor of methamphetamine. According to CC-1, TAYLOR advised CC-1 that TAYLOR travelled from Virginia to New York to acquire upwards of ten pounds of methamphetamine on a weekly basis. TAYLOR would then travel back to the Western District of Virginia to re-distribute the methamphetamine.

10.     CC-1 advised that CC-1 had obtained methamphetamine from TAYLOR on, at a minimum, four different occasions in 2021. CC-1 advised law enforcement that TAYLOR commonly used a silver Dodge Charger to deliver the methamphetamine to CC-1.

11.     CC-1 advised that TAYLOR was previously armed with a handgun during at least one of the aforementioned methamphetamine transactions between TAYLOR and CC-1.

12.     On October 27, 2021, CC-1 provided law enforcement with a cellular phone number used by TAYLOR to facilitate narcotics transactions. That cellular phone number was 406-272-9666. Law enforcement found that number to be stored in CC-1's cellular phone under the contact name of "JAE".

13.     CC-1 advised law enforcement that CC-1 would be willing to contact TAYLOR and order one pound of methamphetamine from TAYLOR under the controls of a controlled purchase for law enforcement. CC-1 advised that CC-1 would be willing to testify as a witness in court to those actions.

14.     On October 27, 2021, law enforcement carried out a controlled purchase using CC-1. CC-1 contacted 406-727-9666 via text message and phone call in the presence and direction of law enforcement. During the exchange of communications, TAYLOR agreed to sell CC-1 one pound of methamphetamine for $5,500.00 United States Currency ("USC"). TAYLOR also agreed to deliver the methamphetamine to Lynchburg, Virginia.

15.     While waiting for TAYLOR to deliver the methamphetamine, CC-1 received a phone call from 406-727-9666. However, CC-1 could not hear TAYLOR talking from the other line. The phone call was then disconnected. Within seconds of that call terminating, CC-1 received a phone call from cellular phone number 540-632-3280. CC-1 answered that phone call. The caller advised CC-1 "It's me… I'm on my way… You got all the bread…". CC-1 advised that the caller was TAYLOR. This affiant knows "bread" to be street slang for currency.

16.     Later that same evening, during the course of the controlled purchase supervised by law enforcement, TAYLOR delivered CC-1 approximately one pound of a substance that field tested positive for methamphetamine. That controlled purchased took place in Lynchburg, Virginia. Before and after the controlled purchase, law enforcement searched CC-1 and his vehicle and no contraband was located. Upon completion of the controlled purchase, law enforcement followed TAYLOR back to Roanoke, Virginia. During the post-buy surveillance, law enforcement identified the driver, and sole occupant, of the vehicle used to deliver the methamphetamine as Jeriwon TAYLOR. The vehicle that was used by TAYLOR to facilitate the

6

methamphetamine transaction was found to be owned by PV Holdings Corporation, a rental vehicle provider.

17.    In October of 2021, law enforcement served an Administrative Subpoena on PV Holdings Corporation for the name of the individual who rented the vehicle used to facilitate the controlled purchased that transpired on October 27, 2021. A representative of PV Holdings Corporation advised law enforcement that the renter, during the requested time period, was Jeriwon TAYLOR, Operator's License Number T69783020. TAYLOR provided a home address of **Target Address #3.** The representative advised that TAYLOR provided a contact number of 540-795-9022 on the reservation.

18.    In October of 2021, law enforcement served an Administrative Subpoena on VERIZON WIRELESS for subscriber information on the cellular phone number 540-632-3280. A custodian of records for VERIZON WIRELESS advised law enforcement that the subscriber for that number was Jeriwon TAYLOR with a billing address of **Target Address #3**. It was also advised that the cellular phone number was activated in July of 2021.

19.    In November of 2021, law enforcement served an Administrative Subpoena on VERIZON WIRELESS for subscriber information on the cellular phone number 540-795-9022. A custodian of records for VERIZON WIRELESS advised law enforcement that the subscriber for that number was Jeriwon TAYLOR with a billing address of **Target Address #3**. It was also advised that the cellular phone number was activated in July of 2021.

20.    In November 2021, law enforcement obtained and executed a state of Virginia search warrant (680CM2100014220), issued by a Magistrate of the Commonwealth of Virginia, for geo-location data pertaining to cellular phone number 540-632-3280. Law enforcement began receiving that geo-location data on November 3, 2021.

21.     On November 9, 2021, law enforcement utilized CC-1 to conduct a second controlled purchase of one pound of crystal methamphetamine from TAYLOR. Prior to the purchase, law enforcement searched CC-1's vehicle and located a firearm. The firearm was seized and the potential criminal violation was referred to the Commonwealth Attorney's Office for evaluation. After removing the firearm, law enforcement found no additional contraband and continued with the controlled purchase. This transaction took place on the parking lot of the Valley View Mall located in Roanoke, Virginia. CC-1 provided TAYLOR with $5,500 USC of Special Service funds in exchange for the methamphetamine. The substance provided by TAYLOR field tested positive for methamphetamine. During the course of this controlled purchase, TAYLOR delivered the methamphetamine to CC-1 while operating a blue Lincoln Town Car. A query of the license plate (North Carolina FFL9789) on that vehicle determined that Christie Nicole CUNNINGHAM-TAYLOR was the registered owner of the vehicle.

22.     A public search of Facebook located an account with the name of Nicole CUNNINGHAM-TAYLOR. The posts and photographs uploaded to that account, which were viewable to the public, include photographs of CUNNINGHAM-TAYLOR and TAYLOR dressed in wedding attire (wedding gown and tuxedo). These photographs were uploaded in June of 2021. The statement attached to the uploaded photographs stated that CUNNINGHAM and TAYLOR were celebrating their ten-year wedding anniversary. The following hashtags were also attached to the post; "#jay #jeriwon".

23.     On November 21, 2021, law enforcement was monitoring the geo-location data of TAYLOR's cellular phone. During that analysis, law enforcement observed that TAYLOR's cellular phone was plotting, at 7:58PM, within a 1,411-meter radius of TARGET ADDRESS #2. TAYLOR's cellular phone then began to gradually plot towards Lynchburg, Virginia.

8

24.     Law enforcement continued to monitor TAYLOR's cellular phone location and determined that TAYLOR's cellular phone arrived in Lynchburg, Virginia at approximately 9:43PM. TAYLOR's cellular phone was plotting within a 165-meter radius of the 3900 block of Wards Road, Lynchburg Virginia. This particular block of Wards Road contains Wal-Mart and a Cracker Barrel restaurant. TAYLOR's cellular phone remained in that geographical area until approximately 1028PM when TAYLOR's cellular phone began travelling back towards Salem, Virginia.

25.     Law enforcement continued to monitor TAYLOR's cellular phone location and determined that it travelled back to and arrived, at approximately November 22, 2021 at 12:43AM, in a geographical area of a 272-meter radius that encompassed TARGET ADDRESS #1. TAYLOR's cellular phone remained in that geographical area for the remainder of that morning.

26.     On November 21, 2021, at approximately 10:27PM, law enforcement responded to the 3900 block of Wards Road, Lynchburg Virginia to investigate a complaint of a "shots fired" call. Witnesses to the incident reported to law enforcement that a black male, operating a silver Dodge Charger with black wheels, was shooting a handgun at another individual in the parking lot. Law enforcement recovered multiple cartridge casings of 9mm and .380, and evidence that suggested vehicles parked in the parking lot were struck by gun fire. Law enforcement obtained surveillance footage of the described incident. In that video, an individual was observed exiting the passenger seat of the Dodge Charger and then exchanging gun fire with the driver of the Dodge Charger.

27.     On November 22, 2021, law enforcement responded to the SUPER 8 hotel (3736 Candlers Mountain Road, Lynchburg Virginia) to investigate a domestic disturbance complaint.

9

During the investigation of that complaint, law enforcement located CC-1 and Co-conspirator #2 ("CC-2") inside of room 219 of that establishment.

28.     CC-2 has been charged in Lynchburg, Virginia for narcotics distribution and firearms-related offenses and is awaiting trial.

29.     During the course of that investigation, law enforcement observed a substance, that later field tested positive for methamphetamine, in plain view inside of that room. Law enforcement then obtained and executed a search warrant (680CM2100015139), issued by a state magistrate, for indicia of narcotics possession in that room.

30.     A subsequent search of room 219 yielded approximately five hundred grams of methamphetamine, twenty grams of suspected heroin, approximately $1,400 USC, and two firearms.

31.     Law enforcement then conducted a post-Miranda interview of CC-2. CC-2 made statements to law enforcement against their penal interest. CC-2 advised law enforcement that CC-2 assisted CC-1 with the distribution of crystal methamphetamine and heroin. CC-2 advised law enforcement that CC-1 had obtained two pounds of methamphetamine from "JAE" on November 21, 2021. CC-2 advised that CC-1 had met "JAE" at the Wal-Mart on Wards Road, Lynchburg, Virginia. CC-2 advised that CC-2 told prospective buyers of the methamphetamine that CC-2 and CC-1 had just "hit a lick" and were selling the methamphetamine for cheaper than usual. This affiant knows that "hit a lick" is street slang for conducting a robbery.

32.     Law enforcement also conducted a post-Miranda interview of CC-1. CC-1 initially denied any knowledge of the items located in the aforementioned hotel room. CC-1 then advised that, on the evening of November 21, 2021, CC-1 contacted TAYLOR and ordered two pounds of methamphetamine. CC-1 advised that later that same evening CC-1 met TAYLOR in

the parking lot of Wal-Mart (Wards Rd, Lynchburg, Virginia). CC-1 advised that CC-1 got into TAYLOR's vehicle, a silver Dodge Charger. TAYLOR provided CC-1 a Sheetz bag containing two pounds of crystal methamphetamine and one ounce of heroin. CC-1 advised that CC-1 then produced a handgun and struck TAYLOR with the firearm. CC-1 advised that CC-1 exited the vehicle with the bag of narcotics and fled on foot. CC-1 advised that while running away, TAYLOR began shooting at CC-1. CC-1 advised that CC-1 began shooting at TAYLOR with CC-1's firearm. CC-1 advised that CC-1's firearm was a Ruger LCP .380 handgun. CC-1 advised that CC-1 then hid the firearm in a drainage ditch in the 3900 block of Wards Road, Lynchburg, Virginia.

33.     CC-1 later escorted law enforcement to the location in which CC-1 hid the firearm. Law enforcement located the aforementioned firearm at the location described by CC-1.

## CRIMINAL ACTIVITY ASSOCIATED WITH TARGET ADDRESSES

### *TARGET ADDRESS #1*

34.     On November 3, 2021 law enforcement began searching the geographical area, provided by the cellular provider, which encompassed the target phone. This area ranged from a 246-meter to a 653-meter area. During the search within that area, law enforcement located a silver Dodge Charger, with black wheels, parked in the lot of a McDonald's restaurant. Law enforcement conducted a query of the license plate (Virginia 3871LR) of that vehicle and determined the registered owner was Jeriwon TAYLOR, Operator License Number T69783020, of Roanoke, Virginia. Law enforcement conducted surveillance on that vehicle and observed TAYLOR exit the restaurant, walk across the street, and into TARGET ADDRESS #1. TAYLOR later exited TARGET ADDRESS #1, holding a white plastic bag, enter the Dodge Charger and drive away.

11

35.    On November 16, 2021, law enforcement conducted a surveillance of TARGET ADDRESS #1. During that surveillance, law enforcement observed TAYLOR and a white female exit TARGET ADDRESS #1 and enter a BMW sedan (Virginia registration DBX3) that was parked in front of TARGET ADDRESS #1.  That vehicle was followed to a local restaurant and then back to TARGET ADDRES #1. TAYLOR's cellular phone (540-632-3280) was plotting in a radius of approximately 653 meters. TARGET ADDRESS #1 was encompassed in that geographical area. The registered owner of the vehicle was determined to Stephanie BOOKER. The photograph on file with the Department of Motor Vehicles for BOOKER resembled the female who law enforcement observed leaving TARGET ADDRESS #1 and driving the BMW sedan.

36.    On November 17, 2021, law enforcement conducted surveillance of TARGET ADDRESS #1. During that surveillance law enforcement observed TAYLOR exit TARGET ADDRESS #1 and approach the aforementioned silver Dodge Charger which was parked in front of TARGET ADDRESS #1. TAYLOR then collected mail from the mailbox associated with TARGET ADDRESS #1 and then reenter TARGET ADDRESS #1. TAYLOR's cellular phone (540-632-3280) was plotting in radius of approximately 653 meters. TARGET ADDRESS #1 was encompassed in that geographical area.

37.    On November 18, 2021, law enforcement conducted as surveillance on TAYLOR. Law enforcement located TAYLOR, via geo-location data, in Roanoke, Virginia operating the aforementioned Dodge Charger. During that surveillance, TAYLOR was followed back to the area of TARGET ADDRESS #1. TAYLOR was observed walking away from the Dodge Charger, which was parked in the parking lot directly across the street from TARGET ADDRESS #1, and into TARGET ADDRESS #1.

12

38.    On November 24, 2021, law enforcement observed the previously mentioned blue Lincoln Town Car (North Carolina tag FFL 9789) parked in the parking lot of the McDonald's directly across from TARGET ADDRESS #1.

39.    On November 29, 2021, law enforcement observed TAYLOR operating the aforementioned blue Lincoln Town Car. TAYLOR was observed parking the vehicle in the lot of the McDonald's restaurant which is located across the street of TARGET ADDRESS #1. Law enforcement then observed TAYLOR walk towards the rear entrance of TARGET ADDRESS #1. TAYLOR's cellular phone was plotting in a radius of approximately 653 meters. TARGET ADDRESS #1 was encompassed in that geographical area.

40.    In November 2021, law enforcement spoke with a Special Agent of the Office of Inspector General Office. The Special Agent advised that, based on United States Postal Service records, a parcel addressed to TAYLOR at TARGET ADDRESS #1 was delivered to TARGET ADDRESS #1 in September of 2021.

41.    In November 2021, law enforcement obtained the aforementioned state warrant (680CM2100014220) for the geo-location on the cellular phone being used by TAYLOR to facilitate drug transactions. Of the available data at the time of the authoring of this affidavit, law enforcement received approximately 2,593 location points. Of those points, TAYLOR's cellular phone plotted within a 1/10th of a mile radius of TARGET ADDRES #1 1,536 times.

### *TARGET ADDRESS #2*

42.    On November 3, 2021, law enforcement followed TAYLOR to the U-Haul Storage facility (3434 Salem Turnpike NW, Salem Virginia) and enter TARGET ADDRESS #2.

43.    In November 2021, law enforcement served an Administrative Subpoena for information regarding the names, addresses, and telephone numbers of all storage units located at

3434 Salem Turnpike NW, Salem Virginia. Based on the data provided, law enforcement determined that Stephanie BOOKER ("BOOKER") was the renter of TARGET ADDRESS #2. BOOKER provided a contact number of 540-330-1294.

44.     In November 2021, law enforcement served an Administrative Subpoena on SPRINT for subscriber and toll record data associated with phone number 540-330-1294. The subpoena requested data between the dates of October 9, 2021 through November 9, 2021. Based on the data received from SPRINT it was determined that BOOKER was the subscriber for the phone number. It was determined that the account for that number was established in July of 2020. It was further determined that the cellular phone number 540-795-9022 was the top contact of BOOKER during the time period. As noted previously in this affidavit, that phone number (540-795-9022) was previously determined to be used by TAYLOR as a contact number to make the reservation for the rental vehicle used during the first controlled purchase of methamphetamine from TAYLOR.

45.     The property manager of the U-Haul Storage facility, that encompassed TARGET ADDRESS #2, gave law enforcement verbal permission to walk the facility. Law enforcement observed "B30" posted on the door of TARGET ADDRESS #2. Law enforcement observed that the door of TARGET ADDRESS #2 was secured with a padlock. The property manager advised that only the renter of the storage unit should have a key to the lock.

46.     On November 9, 2021, upon completion of the aforementioned controlled methamphetamine purchase, TAYLOR was followed by law enforcement directly to the U-Haul facility that encompassed TARGET ADDRESS #2. TAYLOR was then observed by law enforcement entering TARGET ADDRESS #2.

14

47.     Law enforcement observed the previously mentioned blue Lincoln Town Car (North Carolina tag FFL 9789) parked within the security fence of the U-Haul storage facility containing TARGET ADDRESS #2 between November 15, 2021 and November 22nd, 2021.

48.     On November 29, 2021, law enforcement observed TAYLOR operating the aforementioned blue Lincoln Town Car. TAYLOR was followed, in that vehicle, to the U-Haul facility that encompassed TARGET ADDRESS #2. TAYLOR was seen standing at the door of TARGET ADDRESS #2 and looking at the lock on the door.

49.     In November 2021, law enforcement obtained the aforementioned state warrant (680CM2100014220) for the geo-location on the cellular phone being used by TAYLOR to facilitate drug transactions. Of the available data at the time of the authoring of this affidavit, law enforcement received approximately 2,593 location points. Of those points, TAYLOR's cellular phone plotted within a 1/10th of a mile radius of TARGET ADDRES #2 approximately 76 times.

### *TARGET ADDRESS #3*

50.     In November 2021, law enforcement obtained the aforementioned state warrant (680CM2100014220) for the geo-location on the cellular phone being used by TAYLOR to facilitate drug transactions. Of the available data at the time of the authoring of this affidavit, law enforcement received approximately 2,499 location points. Of those points, TAYLOR's cellular phone plotted within a 1/10th of a mile radius of TARGET ADDRESS #3 approximately 162 times.

51.     On November 30, 2021, law enforcement was monitoring the geo-location data of TAYLOR's cellular phone. Based on that data it was determined that the cellular phone plotted in a geographical area of approximately 488 meters. TARGET ADDRESS #3 is encompassed in that geographical area. Law enforcement observed two vehicles parked on the curtilage of

TARGET ADDRESS #3 during that time. One vehicle was the aforementioned blue Lincoln Town Car (used during second controlled purchase of methamphetamine from TAYLOR). Law enforcement also observed a 2021 Honda SUV (Virginia tag VHX 1444). That vehicle was found to be registered to Christie CUNNINGHAM-TAYLOR of TARGET ADDRESS #3. Later that same day TAYLOR's cellular phone was plotting in a geographical area encompassing TARGET ADDRESS #2. Law enforcement observed that the aforementioned Lincoln Town Car had moved and was parked in front of TARGET ADDRESS #2.

52.     As previously mentioned in this affidavit, TAYLOR has claimed TARGET ADDRESS #3 as his home address to the Department of Motor Vehicles, on a rental agreement with PV Holding Corporation, and as a billing address for two separate VERIZON WIRELESS numbers in which TAYLOR was the listed subscriber. One of those number was used to facilitate a controlled purchase of methamphetamine.

### CONDUCT OF DISTRIBUTORS OF CONTROLLED SUBSTANCES

53.     Based upon my training, expertise, and experience, I know that:

    a.     Distributors of controlled substances and money launderers often keep ledger books, telephone books, receipts, drug/money customer lists, photographs and other papers that identify co-conspirators and their locations or residences and that relate to the importation, transportation, purchasing and distribution of controlled substances and proceeds derived from said sales;

    b.     Drug traffickers generate substantial profits as a result of drug dealing which the courts have recognized as probative evidence of crimes motivated by greed, in particular, trafficking controlled substances.  Drug

16

traffickers often place assets in corporate entities in order to avoid detection of those assets by law enforcement agencies.  These assets often are placed in other person's names, even though the drug dealers continue to use these assets and exercise dominion and control over them.  They also often maintain on hand large amounts of United States currency in order to operate and finance their ongoing drug business;

c.     Drug traffickers commonly "front" (i.e. provide on consignment) controlled substances to their clients and the aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the drug traffickers have ready access to them.

d.     It is common practice for large scale drug dealers to secrete contraband, proceeds and drug sales and records of drug transactions in secure locations within their residences, stash houses, and/or places of business for ready access and to conceal such items from law enforcement authorities.

e.     Persons involved in large scale drug trafficking often conceal in their residences, stash houses, and/or places of business, caches of drugs, large amounts of currency, financial instruments, precious metals, jewelry, automobile titles and other items of value which are proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting or spending large sums of money acquired from engaging in narcotics trafficking activities;

f.     When drug traffickers amass large proceeds from the sale of drugs, they

often attempt to legitimize or "launder" these profits.  To accomplish this,

drug traffickers may utilize, but are not limited to, domestic and foreign

banks and/or financial institutions and their attendant services, such as

securities, cashier's checks and money drafts;

g.     It is common practice for large-scale drug traffickers to travel to their

source and distribution points to facilitate their trafficking.  After

purchasing their drugs, drug traffickers often transport or cause to be

transported their drugs to areas in which they will distribute them.  The

methods of transportation include, but are not limited to, commercial

carriers, private airplanes, ocean going motor vessels, rental or private

automobiles, and government or contract mail carriers;

h.     Drug traffickers commonly cause to be taken photographs of themselves,

their associates, their property and items used in the distribution of

controlled substances.  These traffickers usually maintain these

photographs at their residences or places of business;

i.     Drug traffickers use safes, surreptitious compartments and money

counting machines to count and store the profits of their narcotics

business;

j.     Drug traffickers commonly possess at their residences, stash houses, or

places of business, drugs, paraphernalia, and materials for packaging,

cutting, weighing and distributing controlled substances, including, but not

limited to scales, plastic wrap, and plastic baggies.

18

k.      Drug traffickers commonly use electronic devices and storage components including, but not limited to, cellular telephones, computers, telex machines, facsimile machines, currency counting machines, telephone answering machines, computer software, tapes, discs, CD, DVDs,  and audio tapes to store records of drug sales, ledgers, supplier's/customer's contact information, financial records, images, audio/video recordings and other related documents related to the trafficking and sale of narcotics.

l.      Drug distributors sometimes take or cause to be made photographs or videotapes of themselves, their associates, their property, and their product.  These distributors usually maintain these photographs or other video materials in their possession.

m.      Drug distributors and sellers commonly have in their possession, either on their person or in their residence and/or business, firearms, such as handguns, pistols, rifles, shotguns, and other types of firearms.  Said firearms are used to protect and secure drug distributor's and seller's property.

n.      Drug distributors often keep records of their illegal activities for a period of time extending beyond the time during which they actually possess illegal controlled substances.  This allows drug distributors to keep records that would assist them in making contact with their criminal associates for possible future drug transactions; and so that they can have records of prior transactions for which, for example, a distributor might still be owed money, or might owe someone else money.

19

54.     Based on the aforementioned, your affiant respectfully submits that there is probable cause to believe that U.S. Currency, documentation, and/or other items related to the illegal distribution of narcotics and money laundering will be located within the Western District of Virginia at the TARGET ADDRESSES.

**USE OF SMALL, UNMANNED AIRCRAFT SYSTEM FOR SEARCH**

55.     For purposes of law enforcement safety, particularly in light of TAYLOR's use of a firearm during an attempted drug distribution that led to him being robbed, your affiant respectfully submits that it is appropriate for law enforcement to make use of a small, unmanned aircraft system (SUAS) as part of its methods in effecting the search.

56.     The use of a SUAS with a camera system will be able to provide a real-time live camera view feed of portions inside the residence.  The SUAS will be used to clear any open area within or outside the residence listed in this affidavit.  The SUAS to be used is registered with the Federal Aviation Administration (FAA) and would be operated by a FAA Part 107 licensed operator.  Based on the nature of the crimes being investigated, and the potentially violent nature of the suspect, the use of this equipment will provide for a safer option in an effort to locate the suspect within the residence and/or clear the residence or portions of the residence of any other potential hazards without putting law enforcement officers in danger.

**COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

57.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic

storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

58.   *Probable cause.*  I submit that if a computer or storage medium is found on the TARGET ADDRESSES, there is probable cause to believe relevant records will be stored on that computer or storage medium, for at least the following reasons:

  a.   Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

  b.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

  c.   Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form

of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

59.  *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the TARGET ADDRESSES because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage

22

media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.    As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP

addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

60.    *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make

25

an image copy of storage media.  Generally speaking, imaging is the taking of a complete

electronic picture of the computer's data, including all hidden sectors and deleted files.  Either

seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded

on the storage media, and to prevent the loss of the data either from accidental or intentional

destruction.  This is true because of the following:

      a.    <u>The time required for an examination</u>. As noted above, not all evidence

          takes the form of documents and files that can be easily viewed on site.

          Analyzing evidence of how a computer has been used, what it has been

          used for, and who has used it requires considerable time, and taking that

          much time on premises could be unreasonable. As explained above,

          because the warrant calls for forensic electronic evidence, it is exceedingly

          likely that it will be necessary to thoroughly examine storage media to

          obtain evidence.  Storage media can store a large volume of information.

          Reviewing that information for things described in the warrant can take

          weeks or months, depending on the volume of data stored, and would be

          impractical and invasive to attempt on-site.

      b.    <u>Technical requirements</u>.  Computers can be configured in several different

          ways, featuring a variety of different operating systems, application

          software, and configurations.  Therefore, searching them sometimes

          requires tools or knowledge that might not be present on the search site.

          The vast array of computer hardware and software available makes it

          difficult to know before a search what tools or knowledge will be required

          to analyze the system and its data on the premises.  However, taking the

storage media off-site and reviewing it in a controlled environment will

allow its examination with the proper tools and knowledge.

c.   <u>Variety of forms of electronic media</u>.  Records sought under this warrant

could be stored in a variety of storage media formats that may require off-

site reviewing with specialized forensic tools.

61.   *Nature of examination*.  Based on the foregoing, and consistent with Rule

41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying

storage media that reasonably appear to contain some or all of the evidence described in the

warrant, and would authorize a later review of the media or information consistent with the

warrant.  The later review may require techniques, including but not limited to computer-assisted

scans of the entire medium, that might expose many parts of a hard drive to human inspection in

order to determine whether it is evidence described by the warrant.

## CONCLUSION

62.   I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the locations and vehicles described in Attachment A, in order to

seek the items described in Attachment B.

## REQUEST FOR SEALING

63.   It is respectfully requested that this Court issue an order sealing, until further

order of the Court, all papers submitted in support of this application, including the application

and search warrant.  I believe that sealing this document is necessary because the items and

information to be seized are relevant to an ongoing investigation into the criminal organizations

as not all of the targets of this investigation will be searched at this time.

27

64.     Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted.

*/s/ Daniel Bailey*
Daniel Bailey
Drug Enforcement Administration
Task Force Officer

SUBSCRIBED and SWORN to before me by telephone on  December 1, 2021.

*Robert S. Ballou*
United States Magistrate Judge
United States District Court for the Western District of Virginia

28